## Axton v. Axton.

(Decided June 17, 1919.)

Appeal from Daviess Circuit Court.

E. B. ANDERSON and BURTON VANCE for appellant.

W. P. SANDIDGE and BLAKEY & LEWIS for appellee.

(For opinion see 182 Ky. 286.)

RESPONSE BY JUDGE SAMPSON TO PETITION FOR REHEARING—Overruling petition and extending opinion.

The petition for rehearing is long, and assails the opinion delivered November, 1918, for inaccuracy in statement of facts as well as the application of the law.

A re-examination of the record on appeal confirms us in the belief that the appellee, Mrs. Axton, was not entitled to a judgment of divorce nor to the allowance of alimony made by the learned chancellor. The evidence is too long—2100 typewritten pages—to review in whole, but we will examine it briefly, taking its salient parts, that the reasons for our conclusions may more fully appear.

Woodford F. Axton and Miss Jessie Jolly, now Mrs. Axton, were reared in the same town. Just when they became acquainted does not clearly appear, but some two

years before their marriage on July 24, 1915, they began to occupy the relation of sweethearts. At this time Mr. Axton lived in Louisville, while Miss Jolly resided with her father in Owensboro. He was about forty-two or forty-three years of age, and she was about thirty-seven. Occasionally he went to Owensboro to call on her, and she was in Louisville on a few occasions, and he saw her there. It appears that Mr. Axton fell desperately in love with Miss Jolly and proposed marriage to her soon after they began to associate together. She at first did not give her consent to marry him, but later did do so, and a wedding date was fixed, whether by Mr. Axton only or by both is disputed, but at least appellant suggested a day for the wedding and made arrangements accordingly. But as the time approached Miss Jolly postponed the wedding over the protest of Mr. Axton. When asked in her deposition when she first became engaged to marry Mr. Axton, appellee says: "Well, I was never definitely engaged to marry him; it was postponed from time to time, because I felt all along that I did not know him, and had not known him well, and I would not call it a definite engagement any time along this time at all."

"Q. When did you become engaged at all; how soon after that? A. The next spring after I came home from Leavenworth. Q. Never was engaged before that? A. He understood at any time I said I would marry, and I said I thought we had better wait, and I was not sure about it at all. There was nothing specifically definite about it. Q. Didn't you fix a definite date in November, 1914, in which to marry? A. He did. He all along would set days, and he would say we would marry so and so. In fact he said we would marry in September, and I said no, and he said October, and I said no, and finally I said suppose we say November 7th. It was my mother's birthday and I had that idea in my mind that if I did marry, I would rather marry on that time. That was the most definite thing that was said about it. Q. What was the reason you did not marry on November 7th? A. I preferred not to."

About this time Miss Jolly went to Leavenworth, Kansas, for a rest of some weeks.

On September 14, 1914, she wrote the appellant in part as follows:

"Yes, dear, I hope we are intended for each other. It seems very strange doesn't it that you and I, after all the years we've seen and known each other should suddenly fall in love and marry. It does seem like fate—as though it had been intended."

The answers to this and other letters written by Miss Jolly are not in the record, for she says she destroyed them because, as she insists, she did not find them of interest.

On September 22, she again wrote Mr. Axton:

"Don't you ever talk that way again about not being worthy and thinking me such a prize for I am very like all other women—only a little more human perhaps and possessed of even more weaknesses and faults. . . . I know, dear, you are not unkind, but on the other hand kindness itself, and I am also sure I'll have no regrets. . . . As you doubtless have observed I am impulsive—somewhat hot-headed and wilful. I often act on impluse and envy you who can sanely think things over and act accordingly, but I act and think afterwards—often when it is too late. . . . I have been in school so long and never rested any until I am all in and you will find me nervous tho not naturally so and I'll get over it I am sure in short while as I've never been sick any in all my life. When you consider how old I am that is some record, don't you think?"

In a letter of May 28th, she wrote:

"No, I have not reconsidered nor changed my mind either. I am only slowly realizing and trying to readjust myself to the new order of things. Guess I am just 'plum curious,' but I can't help it—it's my misfortune not my fault. Now that I am away from you there are so many things I think of I'd like to say and they sound foolish put down on paper. We can talk better when we see each other again."

When asked if this paragraph from her letter referred to her engagement to Mr. Axton she said:

"Yes, because the way I remember it I had said that all along, I had hesitated. He knows that when I talked to him I would say that possibly we had better wait, and not tell anybody, and I would rather it was not talked about because something might happen. He said had I changed my mind, and I said I had not reconsidered nor changed my mind, but I was trying to readjust

myself, or something to that effect. That is what it refers to, of course, the engagement. When I say 'I am just plum curious,' he would say that it was all right, and it was just I, and I would say perhaps I was just curious. That is what that means.''

Answering a letter from Axton she wrote of date September 30th:

''You are the craziest fellow I ever saw. Why of course we can't marry in September. . . . I know and appreciate how you feel but I also understand just how cross I can be. You better not have to experience it for yourself. . . . About the ring, I'd rather you'd wait until after I resign. . . .''

She wrote him again as follows:

''Believe I'll just come on up to Louisville and marry you right away—do you want me now—right this minute? All joking aside I do think it saves lots of talk and unnecessary gossip to just marry some day without even knowing yourself a half hour ahead.''

That she had not overlooked his ability as a business man or the money he had made and was making, the next letter clearly demonstrates:

''I am so glad, Wood, your business is good and the time may come when you won't have to work. Then you and I will have one big time living easy won't we? We can travel—go and come when you please. can't we? You still remain a wonder in my eyes when I think how young—subtle flattery—you are and how you've accomplished so much in a short while. But somehow, dear, when I think of you I am proud not for what you have done but because you have it in your *character* to do things.''

Following this we learn from another letter that she has again broken the engagement. The letter says, in part:

''Say, Wood, I know I am crazy and act like an imbecile, but you must make allowances for am all in just now. Really I am not sorry for any promise I've made nor do I want to take it back for I intend to marry you, but I think by December I'll be all right and not so nervous over things. You are not to slander yourself any more nor say things about your imperfections for we all have them—I as well as you.''

Then this from a later letter shows the attitude of the parties:

"Now, dear, what do you say? Do you think it best to wait—or are you willing to, I mean? I just thought as no one would be at our wedding Marion wouldn't mind, but people may think I should wait and of course I would not hurt Marion for anything. You know all this talk and planning makes me so nervous I could scream and I wish we could just marry without knowing ourselves more than a day ahead."

Still later she wrote:

"You know I am not at all sure I can be ready so early in Feb.—feel as if we had better make it later in month so we won't have to change again. You will begin to think me the most changeable human living and I really am the kind to put off vital things—I always fear a change."

Shortly after the foregoing letter, she wrote in answer to a letter from him about the engagement as follows:

". . . Thought it rather uncalled for that you should say I seem to think it a joke, for you know I do not at all and just what you meant by that I am sure I do not know.

"You remember when you were here you said we *must* marry in Feb. or not at all, and while I intended marrying just felt I'd rather wait awhile. You insisted upon my saying when but I could not name a date and you will not now for fear I may again change. . . . Yes, I do want to marry you but let's just wait for a while and then suddenly get married. What do you say? . . .

"Now listen, Wood, don't worry any more, and above all don't be unhappy over me for we are going to marry some day and perhaps much sooner than we now know."

Ill-humoredly she writes the following letter:

"I have not written before because I scarcely knew what to say to you after the letters you had written. Of course I feel very much hurt, for you certainly have said things I can not quite understand. You remember when you were down here you said you did not think we were suited—what could I think of that except what it implies; and you have always said so much about my being cold and indifferent that it has made me uncomfortable, also made me wonder just what is wrong. You don't

know of course and can't understand just how I have felt. Because I said I could not marry the 6th of February you became angry. Naturally you were provoked, for as you say you had made your plans accordingly. Am awfully sorry if you were inconvenienced—you have lots of trouble on my account haven't you?''

The foregoing letters are sufficient to indicate the attitude of the two, and to establish beyond question that Mrs. Axton was not at all anxious to marry Mr. Axton and was not in love with him up to their marriage. This is further sustained by her testimony when she was asked the following questions and made the following answers.

''Q. Up to that time you were never in love with Mr. Axton? A. Certainly, I thought I was, or I should never have agreed to marry him. Q. You were not certain of it enough to want to marry him? A. I would not want to marry anybody unless I was absolutely certain. Q. When did you become absolutely certain you were in love with him? A. When I agreed to marry him in July. Q. On the day you married him? A. Yes. Q. Then, up to the date of the marriage, you were not in love with him? A. I would not say I was in love with him. I said all along I thought I was in love with him, as sure as you can be of anything until you know people better.''

He, however, from what we gather from these and many other letters was deeply in love with the young lady and was exceedingly anxious to marry her. He fixed the dates for the wedding and she willfully disregarded or broke them. Finally, on July 24th, 1915, they were wedded in Louisville, and the trouble began. The ceremony took place at a church with only the family and a few friends present. The plan was to take a train which left Louisville immediately after the ceremony, for Cincinnati, and this was carried out. In going from the church in an automobile a sister of the bride sat between the couple. This Mr. Axton did not like and insinuates that this happened by design of the bride, but she denies that she was in any way responsible for the occurrence, and says that it made no difference, and the incident was altogether too trifling to claim the attention of any one. He appears to have desired to sit with her, but she did not care whether she sat with him or with some one else. On the train to Cincinnati—the day of

the wedding—he sat facing her and kept looking at her in an admiring way, when she complained to him about keeping his eyes on her, and said some rather unpleasant things for so new a bride. When they entered their room at the hotel in Cincinnati more trouble awaited. There were two beds in the room—twin beds. He remarked on the fact, and wanted to have the beds changed or get a different room, but she objected to the change and insisted that such an arrangement was not only correct but that she would have no other. She testifies that "I was terribly hurt that he should talk so about those beds. I could not get entirely over that feeling. . . . He did not change them (the beds) because I would not allow them to be changed, but it was in his heart and in his feelings, and the way he talked, looked and acted."

"Q. Well, you understood that it was customary in this part of the country for the husband and wife to sleep together? A. That isn't it. You know there is something deeper than that. Q. Well, that is what I am trying to get at. A. Just as I said, it was his manner and his way of acting. Q. You understood that he wanted to sleep in the same bed with you? A. Yes, I understood more. Q. What was it? I want to find out what you understood —what he said or did? A. I understood that the only thought he had was that, and that was what he was thinking about. Q. Well, you knew he was very much in love with you? A. I suppose he was in love with me; I do not know. I do not consider that that was love myself, wholly. Q. You knew it was natural for a man in love with his wife to feel that way, did you not? A. Yes, but not to the exclusion of everything else. Q. That is what you objected to and opposed? A. I objected to the very fact that he should have mentioned such a thing, or said anything about it. There was no reason why he should. Q. Well, was there anything else happened that evening? A. No. Q. You went to your bed and he went to his? A. Yes. Q. Did he make any overtures to you that night, to have intercourse with you as his wife? A. He did. Q. Did you accede to them? A. I did not. Q. In what way did you refuse? A. It was so different from anything I ever dreamed could be, that I just naturally objected to it. I never thought it would be that way. Q. What did you say to him when you objected to it and refused? A. Just what I said to

you; that it did not mean that to me at all; that I could not imagine a man the very first thought being that, and I did object to it.  Well, then he went back to his bed?  A. No, not at once, he did not.  Q. Well, you continued to refuse, did you?  A. I did.  Q. And that ended it for that night?  A. No, not as far as he was concerned. He talked and fussed a good part of the night.''

From Cincinnati they went to Chicago, and she says nothing of importance happened on the trip.  At the hotel that night she says she had intercourse with her husband, but he flatly contradicts that and says she stubbornly refused.  She was asked: ''Q. He was kind and attentive to you all that day, was he not?  A. Oh, yes.''

The next day she says nothing disagreeable happened, and that they had sexual intercourse.  This also is denied by Axton.  She was asked: ''Q. He was agreeable and kind and attentive all day?  A. As much so as I was.  You talk as if he was unusually kind.  He was natural—there was nothing disagreeable.''

While at the Chicago hotel appellee decided to go to a picture show, but she did not ask her husband to accompany her and when asked concerning this, she said: ''We came down together, and as I went through those revolving door, he was standing back there, and I went about a block below the Congress Hotel to the picture show, and I came back to the hotel and could not possibly have been gone more than two hours.

''Q. What was the occasion for him to say that; how did it come up on the conversation when you came back? A. The way I remember it, he was sitting in the lobby, and I think we sat down and he asked me something about the picture show, and was in a perfectly good humor, never said a word, and he said, 'I would have gone to the picture show if you had asked me,' and I said you said you were going to write letters, and that was all that was said about the picture show at all.  Q. Nothing disagreeable occurred all day as far as you recollect between you and the plaintiff?  A. No, not that I know of; I don't recollect anything. Q. His action toward you all day was gentlemanly and kind, was it not? A. Of course.''

While in Chicago on this trip they went out to a cabaret at a pleasure garden, and the wife complains that he did not hire a taxi instead of going on a street

car. Of this she says: "I do not know as you would call it stinginess. I think it was a little inconsiderate. Q. He was not stingy in anything else, was he? A. No, I thought he was very close. Q. What character of hotel were you staying at? A. The Congress. Q. Was that one of the best hotels in Chicago? A. It is not one of the best. Q. Does it not rank as one of the best hotels on this continent? A. I do not know; I suppose it does."

She also says that while in Chicago he complained "that I was cold and had no feeling, and was cross and just always complaining." From Chicago they went to Detroit, and the relations were about the same there as at Chicago. This trip was by boat, but she did not like the boat much and rather complains that it was not the best boat, although she does not state any specific thing that was wrong. On the boat they occupied separate beds. In telling about the separate beds, she said: "We could not have occupied anything else. There was scarcely room for one. It was very uncomfortable; you could not raise up in the lower bunk. They are really uncomfortable. Q. There was no attempt or desire on the part of either to indulge in any marital right on that trip? A. Well, I do not know whether there was on his part or not; I do not know his desire; he may have. Q. There were no overtures on his part? A. It was not mentioned by him. Q. Well, what was it he said on that trip that a husband should not have said to a wife? A. Why, he did not say anything specially that a husband should not say to his wife; it was his manner, more in the way he went about everything at all times. Q. That was no more than you expected when you married, was it? A. Why, naturally, I am not a child and I am not a fool, and when I married I knew what to expect—I thought I knew what to expect—but I did not know and I could not conceive how that would be always uppermost in any one's mind, and he constantly told me that I was peculiar, and I ought to know what it meant, and that it meant that and nothing more. I often said it does not mean that to me, and marriage means more than that to me, and his whole argument was that he was a man, and that was what was—what he expected, and I ought to have known that is what marriage meant."

She says with reference to their stay in Detroit:

"He began complaining especially of my manner; that I had no feeling; that I was not like any other woman; that I did not satisfy him at all, and in little ways, and in lots of little ways, he was ugly and disagreeable."

The balance of the wedding trip was about as the foregoing, and her complaints are about the same, each generally without foundation. On one occasion she says she was embarrassed, because her husband corrected a charge in a restaurant ticket. But nearly the whole complaint of appellee is that her husband insisted that as they were married he should be granted marital privileges, which were denied and refused much, if not all, the time. This was the cause of the trouble. It began there and ended there. Appellee attempts to say that he was ungentlemanly and rude to her, but when she is asked to specify the acts which constituted the rudeness and bad manners, she says he complained that she was cold and did not love him, and would not agree to his sexual desires.

While they lived at the Seelbach Hotel she says she did not know the expense of their meals and entertainment, and did not inquire, because, she says, "I did not 'hink it necessary. He told me he had all the money he wanted; his income was at least two or three thousand a month. Q. You just ordered wherever you wanted and whatever you wanted? A. No, sir, I have never been extravagant, and I have always had my own money to spend, and I would not just plunge in and order. Q. You did get everything in the way of food and accommodation that you really desired, did you not? A. Certainly, if I desired it. I did not desire things out of the ordinary. Q. There wasn't any restrictions put on you as to what you should order? A. Except this complaint that I did not eat what I ordered, and there was no use of wasting things; he was not used to that; that if you ordered anything you ought to eat it. And he did not believe in tipping. I gave a boy five cents for bringing water to the room, and he said I ought not to do that, it wasn't necessary; people did not do that. I had been in hotels before, and I knew it was customary to give it if you wanted to. Five cents did not mean much to me."

Appellee's whole complaint is summed up in her testimony in answer to the following questions:

"Q. Now, Mrs. Axton, from the time of your departure from Louisville on the 24th day of July to your

return to Louisville on the 5th, isn't it true that Mr. Axton's conduct was kindly and gentlemanly in all respects except in one relation to you? A. No, it is not true. Q. Well, going back over the whole field, will you specify anything that he did during those nine or ten days that you considered any act or treatment of you that you complain of as ungentlemanly or unkind? A. Why, he complained, as I told you, every night. It was not the one time, it was all the time—every time. Q. Complained on this one subject, is that it? A. Largely so, yes.''

Immediately upon the return from this wedding trip she went to Owensboro to visit her family and remained there five days. She says her husband was in Virginia, but he contradicts this, and says that he tried to keep her from leaving him so soon after the wedding. When she returned he met her at the station. Concerning this she was asked:

''Q. Didn't you ask him at that time if he had gotten a room with two beds in it? A. I may have. I do not know. I did not lay any stress upon it. I may have said, ''Will you get the room with two beds?'' Q. Had there been any objection by Mr. Axton to getting a room with two beds? A. Yes, he objected to it. Q. What reason did he give, any reason? A. No reason, except that he wanted the other way, of course. Q. He did, however, do as you wished and got the apartment with two beds, did he? A. Yes, he did. Q. How did that apartment compare with the other or similar apartment in the Seelbach? A. I never was in any except that one. Q. It was a very comfortable apartment, was it not? A. Yes. Q. Consisted of two rooms and a bath room? A. Yes.''

He gave her several presents, among them a necklace, which she describes, and a $1,000.00 diamond cross, which she says she tried to sell and was only offered $200.00 for it.

She again sums up their trouble in this way:

''Q. And he complained because you did not respond to his affection, is that it? A. That I did not have the feeling that he thought I should have. Q. Why was it that you did not have the feeling that he wanted you to have toward him? A. I could not tell you. Q. You did not have it? A. He said I didn't  Q. As a matter of

fact, in your own consciousness, you knew you did not respond to his emotions? A. Not to the sort of emotions he had. Q. You had no passion, in other words? A. It depends entirely on what you call passion.''

After she left her husband the first time and returned to Owensboro she wrote him very little. One of her letters was in answer to one from him and is as follows:

''Dear Wood:

''Just home from visit to Jennie Green and am sending bills. They are all right. Yes, I bought some things of Stewarts also but can not say just what—several things—but the bills next month will itemize them. Hope you are well and doing nicely.

''Sincerely, Jessie.''

When asked if she did not have a letter from her husband asking her to come back before she wrote the following letter, she said: ''Yes, I think he did ask me to come back and I did go back after this letter was received.'' Her letter follows:

''Dear Wood:

''Well, I've been down home now nearly a week and am still all to pieces and mind so confused I scarcely know what to do. Of course we both realize that things can't go on as they were and unless we *know* they will improve then it seems better for both that we stay apart. You know I want to do what is right and it all seems so horrible to me. But is it right for us to live together when we feel as we do? It is hard to know what is right and for each's happiness. So far I have not told papa— it will distress him to death. He has not gone to St. Louis, but will have to go by Sunday, he says. Papa has had so much to worry him I hate to burden him further. He is an old man and should be free of care and responsibility, but he has as much as ever. We are all helpless and depend on him too much.

''Hope your work has been satisfactory this week, though I fear rain has hindered work. You, no doubt, can work better and your mind clearer with me away. We were both miserable and really through no apparent fault of our own. I appreciate the efforts you make and all you have done and wish I were less particular and critical that I am, but cannot help it—I am that way and there is no getting away from it.

"Forward any mail that may come to me and I'll let you know later how things go.

"I am trying to think it all out and do the best for us both.

"JESSIE."

Another letter from Mrs. Axton to her husband, of date September 2, 1915, is as follows:

"Dear Wood:

"You say in your letter that unless I have changed in my attitude and things are all right you'd rather I did not come back. I feel no differently and can not help it, try as I may. God knows when I married you I did not feel this way, and intended and wanted to do my part and be your wife, but beginning at Cincinnati and later in Detroit and Louisville you talked to me in such a way, insinuating things, swearing at and insulting me until I got perfectly disgusted, and the feeling has grown as you know—things became through desire, but we are entirely different in our education and points of view on all subjects. You can be no sorrier than I—I feel that I cannot stay here and face my friends and hear all the talk; but what can I do? You see we cannot live together unless we feel as we should and the way we were living was awful.

"The bills you sent are all O. K. Am grateful to you and appreciate all you do. Of course you know I have no money and my family is very poor—cannot help me. You will have to support me as I am your wife and work is impossible; could not secure place as I am married. I asked you not to annoy my father by our troubles—even I, his own daughter, would not burden him with talk, but you did so and told him your side withholding what you said and done. He has been very gloomy, and at his age he needs to be sheltered not worried. Why do you talk to my family? You might have more consideration. I have not mentioned it to any one—not even here in my home.

"JESSIE."

To the foregoing letter Mr. Axton wrote:

"Dear Jessie:

"I am much surprised at receiving your letter of yesterday. I have done everything in my power to please you and I have asked how I could do more. Your

answer has been that it was not my fault, but it was yours. You knew as much about my lack of education before I married as you do now. You should not blame me for inability to love you; this you should have determined beforehand. I deeply sympathize with you for the state of mind you find yourself in. I only sent the bills to G. K., of course. I only wanted to know if they were correct. There never was a man that loved a woman more than I do you. You are unjust in laying the blame on me. I am not in any way responsible for the condition you find yourself in. I know it is hard to face your friends. It is hard for me, but that is nothing to the grief that I am going through that you are spared. I love you; you despise me. If you will come back and be my wife in fact I will do all I can for you, but I do not think I am under any obligation to look after you while you refuse to live with me and accuse me of all the things you do, when you above everybody know I have tried to make you happy. I only asked your father to talk to you. You can only keep it from him for a few days longer at most. Anything I have done is with the hope to better conditions. I am going to Battle Creek tonight. I will be back Tuesday. If you feel you can come back and assume the responsibilities of a wife, you are welcome. If not, I feel certain you will have nothing to do with me. In such event I will be sorry, but will feel I have done my full duty by you.

"Yours, Wood."

After that she returned to Louisville and remained only a short time, returning to Owensboro. On September 6, 1915, she wrote him as follows:

"Dear Wood:

"I am coming to Louisville Wednesday afternoon. Feel as I did when I left, but believe it is best thing for us both, for the present at least, to come back. Hope you found Mr. Fisher improved, though at his age it may prove fatal.

"No news at all—will see you Wednesday evening.
"Jessie."

Around these last letters between the parties is the chief battle ground of this litigation. We will analyze and consider these letters later, and see who was right and who was wrong. To a full understanding of the situation we must bear in mind that the whole of the wife's

complaint is that her husband through the honeymoon and afterwards for the few weeks which they lived together, often suggested sexual intercourse, and when refused, as he was most, if not all, the time, insisted that he was entitled as husband to such privileges. In answer to her refusal he often complained that she was cold and indifferent and did not love him as she should. In his deposition Mr. Axton says when asked:

"Q. Did you tell her at that time or any time that she was ill-natured and disagreeable and that you were a fool to have ever married her, that you ought to have known better, and that you were sorry you had married her? Did you make any such statement as that to your wife? A. In Detroit, one time, judge, when I was asking her if there was anyone else, I told her that I was sorry that I had married her, because, not on account of not loving her at all, but because I felt that it was making her miserable and unhappy. That was thoroughly understood. I said: 'I am sorry that I have got you in this fix, but let's go along and do the very best we can and try to think of me the best you can. Tell me where I am deficient and tell me in what way I can help.' And she said: 'You are deficient in most every way.' Q. Was that the occasion on which you asked her if she wanted to marry some one else? A. Yes, sir; I asked her if there was anyone else—anyone else at all —to let me know. Q. Did you say that she was mean or ill-natured or disagreeable? A. No, sir. Q. Did you say you were a fool to have married her? A. No, sir. Q. Or that you ought to have known better? A. No, sir. Q. Or that you were sorry you had married her, except in the connection that you have explained? A. That is the only way."

She left and went to Owensboro, and came back shortly after the wedding trip. Concerning what happened on her return Axton was asked:

"Q. When she came back, beginning right at the depot when you met her at the train, did anything occur there that you remember in the conversation between you at that time? A. Yes, sir. Q. State what that was? A. She said she wanted to know if I had got a room with two beds in it. To begin with she said—I asked her why didn't she come back yesterday. She said she was a fool for coming back, that there was going to be a dance down there that night and she ought to have stayed and gone

to that dance, and then she says: 'Have you got a room
with two beds in it?' I said—without wating for me to
reply, she said: 'If you have not, I am going back on the
next train. I absolutely will not sleep with you in the
same bed.' I said: 'Yes, I have got a room with two beds
in it.' Q. What was her attitude towards you on those
occasions, when she went out among your own people,
brothers and sisters? A. To show rather a disrespect
for me. Q. Do you remember any of those criticisms
she made at that time? A. Yes, sir, about I had my
wife at the table. I had my knife on my plate. I laid
my knife handle on the table and had trailers all around
my plate. It embarrassed her very much when I was
at the table. She said I was impossible. Q. Now were
these remarks made to you in the presence of your fam-
ily? A. Made to my sister. . . . And getting in the
automobile, with my brother's wife sister there,
she would always get on the far side. The three
of us would sit in the back, and she would invariably get
on the far side from me and let my brother's wife's sis-
ter sit by the side of me. She always arranged for her
to be between she and I. Q. Now, Mr. Axton, during
that stay, did she demonstrate or show towards you any
affection or love of any kind? A. Not a particle. Q.
Did you ever make, during that period from August
12th to August 22nd, any overtures to her for sexual
intercourse of any kind that you recall? A. Only possi-
bly I talked to her about it. Q. Did you ever have sexual
intercourse with her during that period or any other
time? A. Absolutely not. Q. Now, Mr. Axton, do you
recall the occasion of her going home the second time on
August 22nd? A. Yes, sir. Q. What was that—the
reason for it? A. I met Susie one night down in the cor-
ridor of the hotel, and Susie said she had come up to
take Jessie home. I asked her to talk to Jessie for me
and see if she could not straighten things up. She said
not, she came to take her home. 'I told you in the begin-
ning that you would not get along well together, and I
told you this in the beginning, that you were going to be
humiliated, and now you are going to be humiliated more,
and I am going to take her home.' She says, 'She is my
sister, and I am going to take her home.' I begged her
not to do so, but on the next—that was along about Fri-
day, I think or Saturday, and on Sunday, why, Mrs.
Axton told me she was going to Owensboro and she didn't

expect to come back again. I pleaded with her and begged her not to do so, and when she said that she was absolutely going home, and she never expected to come back, I was so grief-stricken I broke down and cried. She told me she did not want me to go to the depot on account of my eyes being red from crying, didn't want me to go. I got up and bathed my eyes and bathed my face, and she insisted that I did go with her, but I went to the depot with her anyhow and saw her off on the train. Q. Did she kiss you goodbye that time? A. No, sir; no. Q. What was her attitude toward you at parting? A. Just 'goodbye' and that was all. I did not know whether I would ever see her again or not. Q. How long did she stay away at that time? A. She stayed away until the 8th of September.''

After all this and on August 29, 1915, Axton wrote his wife in substance as follows: ''I am heartbroken. I cannot think of anything I have done to deserve the misery I am now going through. I love you, as you know, and I want above all things that you come back to me at once.''

On September 3rd, he wrote his wife: ''I have done everything in my power to please you. I have asked how I could do more; your answer has been that was not my fault but that it was yours. . . . I deeply sympathize with you for the state of mind you find yourself in. . . . There never was a man that loved a woman more than I love you. . . . I love you—you despise me. If you will come back and be my wife in fact, I will do all I can for you, but don't think I am under any obligations to look after you while you refuse to live with me and accuse me of all the things you do.''

Appellee in an attempt to provoke appellant and obtain grounds for divorce and alimony, came back to Louisville on her final trip and to his greeting, ''Jessie, I am glad to see you back,'' she said, ''Huh, I would not think you would want to see me back after all the lies you have told my father.'' Further she stated: ''I will go to the courts, and I will show you whether you do or not,'' referring to support. Then he said: ''I would not do that. I would go down and talk to my father about that. . . . Then she said: ''I have already talked to him and he has told me that you will have to support me whether I live with you or not.'' He said,

"Well, whenever you start that, you will have a fight on your hands." She said "Yes, you would fight a woman. I just dare you to strike me," and got up in front of me. "I just dare you to strike me." I said, "You know I am not going to strike you. I never struck a woman in my life. I never thought about striking a woman. You know I am not going to strike you." She said, "You would fight me." I said, "Whenever you start to go to the courts to make me support you and you refuse to live with me, you will have a fight on your hands."

At another time she said to me, "How did you get it in your head that you could get a woman's love—respect, let alone her love?" I said, "A woman that would marry me, I would naturally suppose that I had that, if she had any womanly instincts about her before she would marry me." She said, "I will let you know that I have more womanly instincts about me than any woman you ever knew, and that includes your mother. . . . I will let you know I did not come from a crazy family, and you did. . . . That kind of people had better treat me right. That kind of people had better not treat me any other way but right."

After testifying to the foregoing, Mr. Axton was asked:

"Q. During that period, her last stay with you, did she at any time express any affection for you? A. Absolutely not. Q. Any love for you in any way? A. Absolutely not."

He was sick with indigestion one night, and being in great agony he groaned. She complained because it kept her from sleep. He moved into the other room and lay on a couch. She did not offer to minister to him, but said: "I wish you would quit that groaning. You know I can't sleep while you are groaning there that way."

The next morning he arose about 7:30 and went into the bath room and closed the door, whereupon she said in a scolding way: "I want you to quit slamming the doors around here. You laid in there last night, and you groaned all night, and you know that I am nervous and can't sleep. You have got no consideration for me whatever, and here you are up here this morning slamming the doors and not allowing me to sleep. You haven't got any consideration for me at all."

He asked her to sew two buttons on his clothing and she refused and threw the clothing upon the chiffonier, and they laid there until she finally left him. At another time he asked her to put his belt in his trousers while he dressed, and she would not, saying: "I want you to get it out of your head right now that I am going to be putting buttons in your shirts and belts in your trousers. I am not going to start that. I am not going to start that at all."

When appellee's sister came to the Seelbach to visit, the sister occupied another room, and, over the protest of appellant, the wife slept with her sister.

She insulted his friends on different occasions, and on one occasion when a friend and his wife came to him in a public place and asked to be introduced to Mrs. Axton, appellant turned around and presented his friends to his bride, who said, "How do you do?" and turned away, leaving appellant's friends standing there, and these friends thereafter refused to speak to appellant.

A number of small matters and some more serious are complained of on each side, but the test to be applied in this case is, who abandoned the other, or was guilty of acts which caused and produced the abandonment? There is nothing whatever in the charge by the wife that the husband was guilty of cruel and inhumane treatment. She charged that he was so cruel that she was forced to leave him; that he in fact told her to leave; that he did not want her to remain and that he was a fool for marrying her. This only appears in her evidence. She is not corroborated in any material part of this by any disinterested witness, or by any letter of appellant's, while her letters and conduct fully rebut and discredit her own statements. Her chief contentions are that Axton was abnormally sensual and that she was disgusted and shamed by his conduct; that she could not satisfy him although she frequently yielded to his desires. This contention is discredited by her letters. From all the evidence we know that if she yielded to his desires at all during their fifty odd days of married life, it was very seldom, and this was the whole trouble, and when she left him she wrote, "I feel no differently and can not help it, try as I may. God knows when I married you I did not feel this way and intended and wanted to do my part and be your wife, but, &c." This letter informed

Axton, being wholly familiar with the facts, that she had not altered in the least her determination to refuse him his marital rights, but says that at the time she married him she *intended* and *wanted* to do *her part* and be his wife. It does more—it confesses that she had altered her intentions entertained before marriage to be his wife in fact, and had changed her mind and, "try as I may," I feel no differently about performing my duties as wife, and I now tell you I will not yield to you when I return, if ever I do. Proceeding she says in the same letter, "You see we cannot live together unless we feel as we should, and the way we were living was awful." She says that her disgust at sexual intercourse "has grown—things became worse and worse. We are entirely different in our education and point of view on all subjects."

In another letter she reasserts her fixed purpose not to be his wife in fact: "We both realize that things can't go on as they were, and unless we know they will improve then it seems better for both that we stay apart." In another letter she says: "I am coming back to Louisville Wednesday afternoon. Feel as I did when I left, but believe that it is best for us both for the present at least to come back." This letter indicates two things clearly (1) that she would persist in her denial of conjugal rights to her husband; (2) that her coming was only for temporary reasons and with no thought of making a real wife. She left as determined as ever not to yield—but "for the present she would return to her husband."

These letters and testimony of appellee overwhelm the open, unembarrassed mind with the conclusion that she was not in love with her husband at any moment; that from tolerance she passed to contempt, even hate, of her husband, and finally abandoned him overtly as she had in spirit and in effect many weeks before, and the divorce should have been granted to appellant on the ground of abandonment.

Much is said in brief of appellee about the testimony of the physicians concerning the condition of the vagina and especially of the hymen of appellee some months after the separation, and it is argued that the facts support the contention of appellee that she had engaged in copulation. With respect to the hymen one of the physicians who testified for appellee said: "It (the hymen)

was ruptured in two places, anteriorally, principally on the left side and to a more limited degree on the right." On this statement of the condition of the hymen one of the eminent physicians and surgeons of this country testified: "Normally the hymen in sexual intercourse is ruptured completely. Of course, a hymen can be injured without sexual intercourse. Sometimes in children, with an exaggerated sense of cleanliness, mothers and nurses undertake to clean out the genital organs of children, young girls, and they injure the hymen, and rupture it. Sometimes individuals themselves may, for various reasons, undertake to explore the vagina with the fingers and injure the hymen. It could be done in those various ways. But having sexual intercourse, unless it was one of those rare conditions that I have previously alluded to as being anomalous and unusual, sexual intercourse would rupture the hymen in its complete circumference."

"Q. Is that fact that the hymen of the defendant in this case, a woman now thirty-nine years of age, was ruptured as described by Dr. Stirman, any indication at all that she had had sexual intercourse two years ago, or nearly two years ago? A. I don't think it would be *reliable* at all. You mean sexual intercourse with a male? . . . As a rule when a woman has had intercourse with a man the hymen is gone. . . . As a rule when rupture occurs the organ disappears."

With reference to the number of or the amount of intercourse it takes to eliminate entirely the hymen, the specialist says: "As a rule one will eliminate it, and repeated a number of times more so."

Dr. Stirman who testified for appellee says that he made a physical examination of the sexual organs of the wife for the purpose of ascertaining whether she had engaged in sexual intercourse, and while leaning to the opinion that she had indulged he said: "I could not tell that she had ever had sexual intercourse with any man."

One of the physicians, after having the facts stated to him concerning the condition of the hymen at the time of the examination, said: "In such an instance normally the hymen in sexual intercourse would be ruptured completely. But having sexual intercourse would rupture the hymen in its entire circumference." This physician was then asked whether the hymen would exist in whole or in material part after several intercourses, and he

said, '·I don't think so. I don't think it could. Q. Well, could it exist after one intercourse? A. I do not think so; it would be exceptional."

As the two physicians who made the physical examination of appellee testify that the hymen existed, one saying that it was only punctured in two places, it is hardly consonant with reason that the wife had indulged in sexual intercourse to a substantial degree, or in any manner other than superficial. This is only an evidentiary fact tending to prove that appellant's contention is founded in fact and that appellee did not love or care for him, nor treat him as a husband in fact. This accounts for her unusual conduct in abandoning him.

That she had her own way about everything from the time their courtship started until she finally abandoned her husband is fully demonstrated by her own testimony. She allowed him to fix dates for the wedding but she disregarded them at pleasure. He made love to her but she repressed him. All wedding arrangements were suggested by her and his preferences were disregarded. On the wedding trip she had her way first with reference to the twin beds; then how they should sleep. If he wanted to occupy the same bed with her he was refused. In all discussions about where they should go on the trip she prevailed, and he acquiesced, yet she complains that he made all the plans and she acceded. While they lived at the Seelbach she preferred two beds, and, though proetsting, he obtained apartments so equipped. When she decided to go home he could not dissuade her even though he shed tears until his eyes were red, and she was newly wedded; and many other instances might be cited where her wish was law and his desires mere whims to be banished.

The wife is admitted to be of good character and reputation. Nothing save her irritability and the abandonment of her husband is·charged against her; but she charges her husband with most everything that would tend to bring him into·contempt and render him odious. But outside of her testimony there is no evidence to support the charges. Speaking from the record Mr. Axton is a man of mild manners, gentlemanliness, good behavior, discretion and enviable reputation. His life associates all so speak of him. The whole course of his life—it is all reviewed in this record—is marked by fair-

ness and consideration for others, if we may believe the testimony of the large concourse of witnesses who have been his intimate associates. Every one appears to have understood the cause of the trouble, and who was at fault until the litigation began; then there was a new line-up. Even Mrs. Axton's sister, of whom she is very fond, discerned the cause of the trouble and tendered her sympathy and assistance to Mr. Axton shortly after Mrs. Axton left him, for Marion wrote him: "I am afraid yours and J.'s affairs are not running along very smooth, but was so in hopes matters would adjust themselves and wish I could do something to help you, as I am sorry for you. Surely sympathize with you, and if there is anything I can do, let me know."

This sister had a clear insight into the character and temperament of Mrs. Axton, as well as the cause of the trouble. A few days after the letter above quoted was written, Marion again wrote Mr. Axton:

"Dear Wood:

"When I wrote you it was with the idea that I might, in some way, be of some help to you, as I feel very sorry that circumstances are as they are, and have some sympathy for you, as well as respect for *your rights*, and *regard for your feelings;* and *had I* not *felt she would assume responsibilities,* and *adjust herself* to *conditions* I could never have been a witness to the affair.

"If you could persuade her to take an apartment, and be patient with her whims for a few months, possibly she may find herself. Do not attempt to *argue with her.* . . . I know her well. Leave her alone, let her go her way, but still be considerate of her feelings and try to keep your temper, though I know this is all hard to do.

"Don't allow yourself to feel humiliated. You have acted in *good faith. · No blame rests on you.* Destroy this and do not let her know I've written you. It would anger her."

As said in the opinion in this case, a divorce can be granted only to the one not in fault, and the wife in fault is not entitled to alimony or maintenance. On a reconsideration of the whole case, we have no doubt of the correctness of the conclusion reached in the opinion, and it is adhered to.

Petition for rehearing overruled.

Judges Settle and Quin not sitting.